STATE of Wisconsin, Plaintiff-Respondent,

v.

Kevin S. KENNEDY, Defendant-Appellant.†

Court of Appeals

*No. 81–375–CR. Submitted on briefs October 14, 1981.—Decided December 2, 1981.*
(Also reported in 314 N.W.2d 884.)

† Petition to review denied.

626

For the defendant-appellant the cause was submitted on the briefs of *James R. Glover* of *Shellow & Shellow* of Milwaukee.

For the plaintiff-respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *James K. Muehlbauer,* assistant attorney general.

Before Decker, C.J., Moser, P.J., and Randa, J.

DECKER, C.J. We affirm this judgment of conviction for theft by fraud.

Kevin S. Kennedy was tried before a jury for one count of theft by fraud, contrary to sec. 943.20 (1) (d), Stats., and twelve counts of medical assistance fraud, contrary to sec. 49.49 (1) (a) 1, all arising out of his billing procedures as a practicing psychiatrist.

The theft by fraud count arose out of Wisconsin Medical Assistance Physician Services Claim Reports submitted in 1975 and 1976 by Kennedy to Surgical Care Blue Shield (Blue Shield), the fiscal agent in Milwaukee County for Wisconsin's medical assistance program. An investigation conducted in 1977 indicated that for 87 claims submitted for "individual psychiatric examinations," the patient-recipients had never been seen by Kennedy. At trial, the state introduced testimony from alleged recipients of "individual psychiatric examinations" that they had never seen Kennedy and did not recognize him in court.

The twelve medical assistance fraud charges arose out of claim reports submitted in 1978 by Kennedy to Electronic Data Systems Federal, Wisconsin's medical assistance fiscal agent for that time period. An investigation conducted in 1979 indicated that in 12 claims submitted for one hour of psychotherapy, the patient only saw Dr. Kennedy for 15 to 20 minutes. At trial, the state introduced testimony from the 4 patient-recipients for whom the 12 claims were submitted that they did not see Kennedy for an hour.

At the close of the state's case, the trial court granted Kennedy's motion for severance of the theft by fraud count from the 12 medical assistance fraud counts, and proceeded on only the theft by fraud count. He denied Kennedy's motion for mistrial, struck from the record evidence relating to the medical assistance fraud counts, explained the severance to the jury, and at the close of evidence, gave a cautionary instruction.

The jury found Kennedy guilty of theft by fraud "as charged in Count 1 of the information" in the amount of $1,400.

The following arguments are raised on appeal:

(1) The information is void because although it charged that the state of Wisconsin was defrauded, it charged that Blue Shield was deceived;

(2) Because the information charged that the state of Wisconsin was defrauded, the trial court erred in instructing the jury that the state only had to prove that property was obtained from Blue Shield;

(3) The evidence is insufficient to prove that Kennedy defrauded the state of Wisconsin because it appears as likely as not that the money he obtained had been the property of Blue Shield;

(4) The testimony of alleged recipients of "individual psychiatric examinations" that they did not remember

ever seeing Kennedy and did not recognize him in court was insufficient to prove beyond a reasonable doubt that Kennedy had not seen them;

(5) The evidence is insufficient to prove that Kennedy intended "individual psychiatric examinations" to be a false description of services provided;

(6) No theft occurred because Kennedy obtained money to which he would have been entitled had he accurately described his services as "consultation" instead of "individual psychiatric examinations;" and

(7) Kennedy was prejudiced by introduction before severance of evidence related to counts 2 through 13, and the trial court's cautionary instruction was inadequate to overcome this prejudice.

## THEFT BY FRAUD

Section 943.20(1)(d), Stats., provides a penalty for one who:

Obtains title to property of another by intentionally deceiving him with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made. "False representation" includes a promise made with intent not to perform it if it is a part of a false and fraudulent scheme.

The elements of this crime, theft by fraud, are restated in Wis J I—Criminal 1453:

(1) defendant made a false representation to the owner of the property;

(2) defendant knew the representation to be false;

(3) defendant made the representation with the intent to deceive and defraud the owner of the property;

(4) defendant obtained title to the owner's property by the false representation;

(5) the owner was deceived by the representation; and

(6) the owner was defrauded by the representation.[1]

[1] Wis JI—Criminal 1453 states:

The fifth element of this offense requires that (name owner of property) was deceived by such representation. This requires that (name owner of property) must have been induced to and did in fact part with title to (property involved) in reliance (at least in part) upon such false representation.

The sixth element of this offense requires that (name owner of property) was defrauded by such representation. This element requires that (name owner of property) sustained some pecuniary or property loss as a result of such representation.

Our research regarding defendant's entitlement defense. (*see* "Entitlement to Payment" section in text, *infra)* convinces us that the victim's ultimate pecuniary or property loss is not an element of the crime of theft by fraud. *See, e.g., People v. Talbott,* 65 Cal. App.2d 654, 151 P.2d 317, 319–20 (1944):

It is also urged that the exclusion of evidence tending to prove the value of certain property pledged was error. It was contended that notwithstanding proof of encumbrances as to part, the balance was of sufficient value to protect the loan. Such argument was then, and is now, beside the issue. If all of the property was fraudulently represented as unencumbered, the fact that part of it was actually free and clear and sufficiently valuable to protect the loan, is no defense. It should be noted that the State of California is the plaintiff in a criminal action wherein the defendant is accused of an offense against the state. *The victim is merely a witness whose ultimate financial gain or loss, in the circumstances, is immaterial. Financial loss is not a necessary element of the crime.* [Emphasis added.]

*See also People v. Smith,* 5 Parker's Crim. 490 (Sup. Ct. N.Y. 1863), discussed in the "Entitlement to Payment" section, *infra.*

We also believe that the jury instruction misstates the meaning of "deceive" and "defraud." One is deceived when he is misled by defendant's false representation; one is defrauded when he parts with title to something in reliance upon the false representation. *Webster's Third New International Dictionary of the English Language* 584, 593 (1976 unabr.).

Therefore, we conclude that Wis J I—Criminal 1453 must be changed:

## INFORMATION

If an information charges no crime, it is void and the trial court does not have jurisdiction to proceed. *State v. Russo,* 70 Wis. 2d 169, 174, 233 N.W.2d 485, 487 (1975). Kennedy argues that the information in this case fails to charge theft by fraud because it alleges the state of Wisconsin to be the owner of the property taken, but does not allege that the state of Wisconsin was deceived by the alleged false representation. The information instead alleges that Blue Shield was deceived.

The information identifies Blue Shield as the agent of the state of Wisconsin. Where fraudulent representations are made to an agent, the resulting fraud is against the principal. Restatement (Second) of Agency § 315 (1958). *See* also Wis J I—Criminal 1453, at 2. The information charges the crime of theft by fraud.

## ERROR IN INSTRUCTION

The trial court instructed the jury that it could find Kennedy guilty of theft by fraud if it found, *inter alia,* that Kennedy had deceived Blue Shield and defrauded the state of Wisconsin. Kennedy argues that such an instruction cannot be given unless the jury finds that Blue Shield was an agent of Wisconsin. We agree, but

The fifth element of this offense requires that (name owner of property) was deceived by such representation. This requires that (name owner of property) must have been misled by defendant's false representation.

The sixth element of this offense requires that (name owner of property) was defrauded by such representation. This requires that (name owner of property) did in fact part with title to (his) (its) property in reliance (at least in part) on such false representation.

conclude that the instructions as given required the jury to find an agency relationship in order to find Kennedy guilty.

In explaining the deceit element, the trial court instructed the jury that it had to find that Blue Shield "was induced and did part with money" in reliance on a false representation by Kennedy, and that the state of Wisconsin "sustained financial loss[2] *as a result of such representation through* Surgical Care or Blue Shield." [Emphasis added.] The issue of whether the state was deceived by false representations to Blue Shield was implicit in these instructions, presented the agency issue to the jury, and was resolved by the jury.[3]

## OWNERSHIP OF OBTAINED MONEY

The jury found Kennedy guilty of fraudulently obtaining money from the state of Wisconsin. Kennedy contends that based on the record, it appears as likely as not that the money he obtained had been the property of Blue Shield. We view this contention as a challenge to the sufficiency of the evidence to support the verdict rendered by the jury.

The burden of proof is upon the state to prove every essential element of the crime charged beyond reasonable doubt. The test is not whether this court or any of the members thereof are convinced beyond reasonable doubt,

---

[2] We have concluded that it is not necessary to show that the victim of the fraud proscribed by sec. 943.20(1)(d), Stats., sustained financial loss. *See* note 1, *supra.* Any error arising out of the instruction given in this case was in defendant's favor, however, as it required the jury to find something which we now determine is not necessary for conviction.

[3] Because we conclude that the issue of agency was presented to the jury, we do not pass on the propriety of the trial court's finding agency as a matter of law.

but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true. A criminal conviction can stand based in whole or in part upon circumstantial evidence. The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding. Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted. Our review of the record in response to a challenge to the sufficiency of the evidence is so limited by these rules. *Bautista v. State,* 53 Wis. 2d 218, 223, 191 N.W.2d 725, 727–28 (1971). *See also State v. Blaisdell,* 85 Wis. 2d 172, 180–81, 270 N.W.2d 69, 74 (1978).

Considered most favorably to the verdict, the evidence is sufficient to support the finding that Blue Shield never paid out its own money. James A. Schultz, Blue Shield's vice president of government programs, testified that the payment checks were drawn on a checking account into which the state of Wisconsin deposited its money, and that it was his understanding that Blue Shield money was never used. Martin Preizler of the state of Wisconsin testified that fiscal agents issued checks "on behalf of the State." This testimony was not refuted—other testimony on the subject was at best inconclusive, and not contradictory.

## TESTIMONY OF RECIPIENTS

The state called 35 witnesses related to 41 claims for "individual psychiatric examinations" submitted by Kennedy, and sought to establish that the alleged recipients never met with Kennedy. They were asked if they had

ever been seen by Kennedy, and whether they recognized Kennedy when he stood at counsel table. With a few exceptions, the witnesses testified that they could not remember ever seeing Kennedy.

Kennedy contends that this testimony as to lack of memory is insufficient to prove beyond a reasonable doubt that face-to-face examinations had not taken place, because the alleged examinations were one-time events which had taken place four to five years earlier, and it is a reasonable inference that most of the witnesses would not remember such an encounter whether or not one had taken place.

We conclude that the challenged testimony had sufficient probative value to be admitted into evidence, and note that Kennedy never objected to its admission at trial. We also note that Kennedy's trial counsel elicited from most of these recipient witnesses corroborating evidence that in 1977 they had been unable to identify a picture of Kennedy shown to them by an investigator. The jury could have reasonably inferred that the testimony was reliable, especially in light of the corroborating evidence elicited by Kennedy's counsel.

Kennedy argues for the first time in his reply brief that the jury's finding that he obtained $1,400 is contrary to the evidence. He points out that the witnesses regarding 7 of the 41 claims testified that they had in fact seen Kennedy face to face and argues that because each claim was for $35 and this testimony left only 34 claims at issue, a theft of only $1,190 is supported by the evidence.[4]

---

[4] Kennedy contends that this illustrates that the remaining recipient's lack of memory is insufficient to prove that the recipients never saw him face to face for examinations. We conclude that this represents a new argument alleging jury speculation raised for the first time in Kennedy's reply brief.

The value of the property obtained is not an element of the crime of theft by fraud, and is of importance only in determining the applicable penalty on conviction. *Sartin v. State,* 44 Wis. 2d 138, 148, 170 N.W.2d 727, 732 (1969). The exact value of the property obtained, however, is immaterial. The material question is whether the value was in excess of $500. *See State v. Labuwi,* 172 Wis. 204, 208–09, 178 N.W. 479, 480 (1920) ; sec. 943.20 (3) (b), Stats. The record clearly supports a finding that payments in excess of $500 were obtained from the state of Wisconsin as a result of Kennedy's misrepresentations.

## FALSE REPRESENTATIONS

Kennedy raises several arguments in an attempt to show that it is a reasonable hypothesis that his use of the description "individual psychiatric examinations" did not constitute false representation.

Kennedy first argues that it was not necessary for him to conduct face-to-face examinations in the instances supporting the theft by fraud charges, because in each instance he was determining whether psychotherapy should be prescribed, and this determination could be made by reviewing a file without meeting the patient. This argument ignores the fact that nonetheless Kennedy described each determination as an "individual psychiatric examination." The issue is not whether Kennedy could have prescribed psychotherapy by reviewing a file, but whether he conducted "individual psychiatric examinations" as he claimed.

Kennedy also argues that the term "individual psychiatric examination" can connote a case-by-case review of files, or is an accurate description of a file review if someone whose report is in the files has examined the

patients face to face. These arguments ignore the plain meaning of "examination" and the meaning ascribed to it by expert testimony in this case. More importantly, it ignores evidence of Kennedy's actual office procedures. Kennedy's secretary at the time the claims were submitted testified that per Kennedy's directions she submitted claims for "individual psychiatric examinations" when Kennedy stated in dictation that he had "examined [the recipient] in his private office for the purpose of determining the need of [psychotherapy]." She indicated that on medical assistance claims for consultation with other professionals Kennedy described the service performed as a "multi-disciplinary staffing," and that she understood per Kennedy's directions that "individual psychiatric examinations" described Kennedy's first visit with a patient. She also testified that Kennedy assured her that he had in fact personally seen all the recipients when in one instance in 1976 his dictation indicated that he had conducted 20 one-hour "individual psychiatric examinations" in one day.[5]

From this evidence the jury could have reasonably concluded that Kennedy knowingly made false representations when he described services rendered as "individual psychiatric examinations." We will not disturb the findings of the jury.

## ENTITLEMENT TO PAYMENT

Kennedy asserts that a conviction for theft cannot lie where the defendant receives money to which he is entitled, and that because the evidence established that

---

[5] The record also indicates that at a later date, after a John Doe proceeding, Kennedy dictated a letter stating that he had not seen approximately 10% of the recipients of "individual psychiatric examinations" face to face.

Kennedy would have been paid had he accurately described the services rendered as consultation, he received money to which he was entitled.

Section 943.20(1)(d), Stats., requires the state to prove not only Kennedy's intent to defraud, but also that the state was defrauded. Kennedy hypothesizes that because he was entitled to compensation from the state for the services he performed, the state was not defrauded even though he represented that he had performed individual psychiatric examinations.

The vitality of this argument is summarized in 35 C.J.S. *False Pretenses* § 28, at 851 (1960):

> *Obtaining what is justly due.* It has been held that, regardless of the fraudulent means or devices employed, accused is not guilty where he gets only what is due him, as where he procures the payment of a debt due, or possession of property to which he is entitled, for the reason that no injury is done, or that there is a want of fraudulent intent, or for both reasons. However, other decisions criticize and greatly limit this rule, or deny it entirely, and certainly the rule cannot exonerate accused where the facts do not come within it. [Footnotes omitted.]

We join those jurisdictions rejecting the validity of this alleged defense.[6]

---

[6] Both parties contend that the validity of this alleged defense has never been adjudicated in Wisconsin and cite no Wisconsin cases to us. We invite the parties' attention to *Clawson v. State*, 129 Wis. 650, 109 N.W. 578 (1906), in which the Wisconsin Supreme Court purports to adopt the entitlement defense raised by Kennedy. It is apparent from a careful reading of the *Clawson* opinion, however, that despite contrary conclusory language, the court did not apply the defense in resolving the dispute. Instead, the court determined that there was insufficient evidence for the jury to find that the representations made by the defendant were false, and that he was entitled to payment based on the representations made.

*Clawson* cites *Commonwealth v. McDuffy*, 126 Mass. 467 (1879), *People v. Thomas*, 3 Hill 169 (Sup. Ct. N.Y. 1842), and *Rex v. Williams*, 7 Carr. & P. 354, 32 Eng. C.L. 653 (K.B. 1836), as sup-

Pennsylvania rejected this defense in *Commonwealth v. Coleman*, 60 Pa. Super. Ct. 512 (1915). In that case the court held that the trial court had not erred in rejecting the defendant's offer of evidence that the prosecuting witness was, at the time of the alleged fraud, indebted in a greater amount to the defendant. The court concluded that even if such a debt existed, this did not justify the defendant's actions because the defendant committed an offense against the commonwealth when he obtained property from the prosecuting witness. The state of accounts between two individuals, the prosecuting witness and the defendant, is immaterial in such a case. *Id.* at 518–20.

*People v. Thomas*, 3 Hill 169 (Super. Ct. N.Y. 1842), cited in *Clawson*, was restricted to its facts in *People v. Smith*, 5 Parker's Crim. 490, 515–16 (Super Ct. N.Y. 1863), and the entitlement defense was rejected in persuasive dicta questioning the wisdom of recognition of the defense. The court found the defense to be in direct conflict with public policy limiting or rejecting the right to self redress where legitimate means are available for collection of a debt or settlement of account. The court believed that sanction of self redress through artifice and dishonesty would lead to lawlessness, and would encourage alleged debtors to circumvent legitimate dispute resolution and become their own judges, juries, and enforcers. *Id.* at 513–15.

port for adoption of the entitlement defense. Application of *McDuffy* and *Rex v. Williams* was limited in *Commonwealth v. Burton*, 183 Mass. 461, 67 N.E. 419 (1903), to set off of a pre-existing liquidated debt, in which liability and amount are undisputed, evidenced by a note.

Application of *People v. Thomas* was severely restricted in was less than that accepted by those jurisdictions recognizing the continued recognition of the entitlement defense was rejected in dicta discussed *infra* in the text.

██

We reject the validity of Kennedy's entitlement defense. The crime of theft by fraud is, as are all crimes, an offense against the people of the state of Wisconsin, and the victim's final accounting is irrelevant. To recognize the defense would be to sanction self redress through artifice and dishonesty. This we will not do, nor will we impute such intent to the legislature.[7]

## SEVERANCE

Kennedy claims that upon severance of count 1, the trial court should have declared a mistrial because he was irreparably prejudiced by the admission of state's evidence relating to the twelve counts of medical assistance fraud. Alternatively, he contends that the cautionary instructions given to the jury were insufficient to cure the prejudice.

"A motion for mistrial is addressed to the sound discretion of the trial court, and its decision will not be reversed unless there has been 'a clear abuse of discretion.'" *Haskins v. State,* 97 Wis. 2d 408, 419, 294 N.W.2d 25, 33 (1980). "[T]his court will uphold a discretionary decision of the trial court if the record contains facts which would support the trial court's decision had it fully exercised its discretion." *Id.* at 415, 294 N.W.2d at 31.[8]

---

[7] Although we reject Kennedy's entitlement defense on public policy grounds, we also note that Kennedy's alleged entitlement was less than that accepted by those jurisdictions recognizing the defense. Kennedy had to submit a "claim" for each service rendered to a patient or on a patient's behalf, and each claim was subject to rejection by Blue Shield.

[8] Although the trial court stated that it had considered relevant factors in denying Kennedy's motion for a mistrial, the record is devoid of findings.

"[P]ossible prejudice to a defendant is presumptively erased from the jury's collective mind when admonitory instructions have been properly given by the court." *Roehl v. State,* 77 Wis. 2d 398, 413, 253 N.W.2d 210, 217 (1977).

The medical assistance fraud evidence presented to the jury is so different from the theft by fraud evidence that we reject the contention that the jury was not able to separate the two and was confused in reaching its verdict on count 1. It is clear from reading the record that the counts arise from two different time periods, that they were submitted to two different fiscal agents, that they were the result of two different investigations conducted in different years, that the theft by fraud count arose out of multiple one-time patients but the other counts arose out of multiple visits by four patients, and that the issue in count 1 was whether the witness could recognize Kennedy but the issue in counts 2–13 was whether the four patients who had seen Kennedy had seen him for an hour on each occasion.

The trial court instructed the jury, "[Y]ou may consider only the evidence pertaining to Count 1 and you must disregard all of the evidence that was related to the other counts. That evidence includes the evidence concerning claims for Janis Ford, Carrie Dillman, Archie Griffiths, Gary Schowalther, and the EDS Federal claims." He then read count 1 to the jury, and again instructed them that stricken testimony was to be disregarded. These instructions sufficiently identify the stricken evidence. The remaining evidence was clear and sufficient to support the jury's verdict.

Kennedy complains that the instructions did not dispel confusion caused by evidence of Blue Shield's practices after the 1975 and 1976 claims in count 1. This com-

plaint is meritless because Kennedy used such evidence after severance in an attempt to show that Blue Shield would not have rejected claims for consultation in 1975 and 1976. He cannot now complain about the jury considering such evidence.

*By the Court.*—Judgment and order affirmed.